UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DIAMOND WILSON o/b/o W.R.R. JR.,

                                  Plaintiff,

                                                                    Case # 19-CV-671-FPG

v.

                                                                    DECISION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                                Defendant.
_____

**INTRODUCTION**

Diamond Wilson ("Plaintiff") brings this action on behalf of her minor son W.R.R. Jr. ("Claimant") pursuant to Title XVI of the Social Security Act seeking review of the denial of his application for Supplemental Security Income ("SSI"). ECF No. 1. Plaintiff applied with the Social Security Administration ("SSA") for SSI on November 23, 2015, alleging that Claimant had been disabled since December 3, 2012 due to a heart murmur and speech issues. Tr.[1] 15, 58, 154. In May 2018, Plaintiff and Claimant appeared at a hearing before Administrative Law Judge William M. Manico (the "ALJ"). Tr. 15, 30. On June 6, 2018, the ALJ issued a decision finding that Claimant was not disabled. Tr. 15–30. After the Appeals Council denied Plaintiff's request for review, Tr. 1–3, the SSA's decision became final and Plaintiff appealed to this Court. ECF No. 1. This Court has jurisdiction to review the SSA's final decision pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). ECF Nos. 10, 15. For the following reasons, Plaintiff's motion is GRANTED,

---

[1] "Tr." refers to the administrative record in this matter. ECF No. 7.

and the Commissioner's motion is DENIED. The matter is REMANDED to the Commissioner solely for calculation and payment of benefits.

## LEGAL STANDARD

### I. District Court Review

When a district court reviews a final decision of the SSA, it does not "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the court "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks omitted) (citing 42 U.S.C. § 405(g)). The Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted).

### II. Child Disability Standard

An individual under 18 years old will be considered disabled if he or she has a medically determinable physical or mental impairment that results in marked and severe functional limitations and that can be expected to result in death or that has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner must follow a three-step process to evaluate child disability claims. *See* 20 C.F.R. § 416.924. At step one, the ALJ determines whether the child is engaged in substantial gainful work activity. *Id.* § 416.924(a), (b). If so, the child is not disabled. If not, the ALJ proceeds to step two and determines whether the child has an impairment or combination of impairments that is "severe," meaning that it causes "more than minimal functional limitations." *Id.*

§ 416.924(a), (c). If the child does not have a severe impairment or combination of impairments, he or she is not disabled. If the child does, the ALJ continues to step three.

At step three, the ALJ examines whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id.* § 416.924(a), (d). If the child's impairment meets or medically or functionally equals the criteria of the Listings, he or she is disabled. To determine whether an impairment or combination of impairments functionally equals the Listings, the ALJ assesses the child's functioning in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). To functionally equal the Listings, the child's impairment(s) must cause "marked" limitations in two domains or an "extreme" limitation in one domain. *Id.* § 416.926a(a). A child has a marked limitation in a domain when his or her impairment(s) "interferes seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2). A child has an extreme limitation in a domain when his or her impairment(s) "interferes very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3).

## DISCUSSION

### I. The ALJ's Decision

The ALJ analyzed Claimant's benefits application using the process described above. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since the application date. Tr. 18. At step two, the ALJ assessed Claimant with the following severe impairments: restrictive perimembranous ventricular septal defect (a heart murmur), intellectual

disability, and speech delay. *Id.* At step three, the ALJ found that these impairments, alone or in combination, did not meet or medically equal a Listings impairment. Tr. 19.

Next, the ALJ found that Claimant's impairments, alone or in combination, did not functionally equal a Listings impairment. Tr. 19. Specifically, as to the six domains of functioning, the ALJ found that Claimant had a less than marked limitation in acquiring and using information, in attending and completing tasks, in interacting and relating with others, and in moving about and manipulating objects; and no limitations in caring for yourself and in health and physical well-being. Tr. 19–30. Accordingly, the ALJ determined that Claimant was not disabled. Tr. 30.

**II.     Analysis**

Plaintiff argues that the Commissioner's decision should be reversed because the ALJ improperly weighed the evidence, which left his conclusions in the domains of attending and completing tasks and acquiring and using information unsupported by substantial evidence. ECF No. 10-2 at 14–22.[2] The Court agrees.

    **A.     Attending and Completing Tasks**

"In the domain of Attending and Completing Tasks, the Commissioner considers the child's ability 'to focus and maintain . . . attention,' and how well he can 'begin, carry through, and finish . . . activities, including the pace at which [he] perform[s] activities and the ease with which [he] change[s] them.'" *Brown ex rel. J.B. v. Colvin*, No. 12-CV-1062, 2015 WL 1647094, at *3 (W.D.N.Y. Apr. 14, 2015) (alterations in original) (quoting 20 C.F.R. § 416.926a(h)).

---

[2] Plaintiff similarly argues that the Commissioner's conclusion in the domain of interacting and relating with others is unsupported by substantial evidence. ECF No. 10-2 at 23–27. The Court declines to address that argument because remand is appropriate based on the ALJ's failure with respect to the domains of attending and completing tasks and acquiring and using information.

4

Preschool children (individuals ranging from three to six years' old)[3] "should be able to pay attention when . . . spoken to directly, sustain attention to . . . play and learning activities, and concentrate on activities like putting puzzles together or completing art projects." 20 C.F.R. § 416.926a(h)(2)(iii). Such children "should also be able to focus long enough to do many more things by [themselves], such as getting . . . clothes together and dressing [themselves], feeding [themselves], or putting away . . . toys." *Id.* They "should usually be able to wait [their] turn and to change [their] activity when a caregiver or teacher says it is time to do something else." *Id.* "A child will be found to have a marked limitation in a domain when his impairment interferes seriously with his ability to independently initiate, sustain, or complete activities." *Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order).

The ALJ found that Claimant "clearly has issues with his abilities in this domain" but concluded that "the evidence as a whole suggests that his restrictions cause less than marked limitations in this area." Tr. 25. Although there are snippets of evidence supporting the ALJ's finding, the record paints the picture of a child that has, at minimum, marked limitations in this domain.

In November and December of 2015, Claimant's capabilities were evaluated by the Buffalo Hearing & Speech Center ("BHSC"). Tr. 390–405. BHSC reported that Claimant was delayed in his ability to follow directions. Tr. 391. Although during one evaluation Claimant was noted to show "good attention to task and follow[] through with requests during the evaluation," Claimant did not demonstrate those skills in the classroom setting and, in a different evaluation, Claimant was noted to be easily distracted throughout testing. Tr. 392–93. BHSC noted that Claimant "often

---

[3] Claimant fell in this age range for almost all the relevant period. Tr. 15, 18. Claimant was an older infant or toddler for purposes of the regulations for less than a month, Tr. 15, 18; 20 C.F.R. § 416.926a(h)(2)(ii), but because of the very limited time frame in which Claimant fell in that age group, the Court focuses its analysis on the regulations applicable to preschool children.

did not follow through with teacher requests" during observation. Tr. 393. Either because of a lack of interest or understanding, Claimant required extra support to complete tasks during BHSC's evaluation. *Id.*

Claimant's school records similarly demonstrate incredible difficulties attending to and completing tasks, even in a highly structured environment. *See Smith v. Massanari*, No. 00-CV-402, 2002 WL 34242375, at *6 (W.D.N.Y. Mar. 17, 2002) (noting that the "Commissioner's regulations require the ALJ to consider the effects of a structured or highly supportive setting . . . on the claimant's functioning"); 20 C.F.R. § 416.924a(b)(5)(iv). Claimant is enrolled in an Individual Education Program ("IEP"), receives speech-language therapy, occupational therapy, and counseling. Tr. 46–47, 199, 261, 276, 328, 355. Claimant is educated in a special education classroom with a small number of other children, a teacher, and one or two assistants. Tr. 46, 276, 328, 355.

In his IEP report from January 2016, Claimant was noted to have "delays in his . . . ability to follow directions [and to] . . . attend to task." Tr. 217. The evaluator attributed these difficulties in part "to self-directed behaviors." *Id.* The evaluator also noted that his teacher was concerned with Claimant's "difficulties engaging in teacher-directed and/or structured activities" because Claimant's "self-directed behaviors often result[ed] in tantrums in the classroom environment when he [wa]s expected to participate." *Id.* Claimant was reported to be "easily distracted throughout testing" and to respond "impulsively and . . . need[s] to be reminded to 'wait and listen.'" Tr. 218. In December 2016, his classroom teacher reported that Claimant was impulsive and required one-on-one assistance throughout the day. Tr. 265. Claimant also reportedly had significant difficulties staying on task during speech therapy. *Id.*

In a "Occupational Therapy Consultation" completed by Buffalo Public Schools in February 2017, Claimant was "notably hyperactive, easily distracted, and extremely impulsive." Tr. 256. He reportedly did not "comply with directives immediately if at all." *Id.* In a "Psycho-educational Evaluation" completed by Buffalo Public Schools in April 2017, the evaluator reported that, although he is making progress in counseling, he still has "a lot of work to do" and requires "extensive prompting and reminders of expectations." Tr. 247–51 He reportedly quickly lost interests in tasks that did not have "manipulatives or picture supports and would begin tangential conversations or refuse to respond" and he was reportedly "easily distracted by the environment . . . and required frequent refocusing prompts and reminders to return to task." Tr. 248. He was further reported to be "restless and overactive" and to require "near constant adult individual supervision and monitoring in order to participate safe[l]y and appropriate in the classroom." Tr. 248, 250. He reportedly displayed "clinically significant levels of . . . hyperactivity, aggression, and attention problems." Tr. 251.

Ann Kostyniak, one of Claimant's teachers, completed a questionnaire in April 2017 and noted that Claimant has numerous limitations in this domain. Tr. 227–34. Ms. Kostyniak reported that he has daily problems ranging from serious to very serious in almost every area related to this domain. Tr. 229. Ms. Kostyniak further reported that he "needs constant one-to-one assistance with most structured activities" and "may need hand-over-hand assistance." *Id.* Claimant is "always seated next to a teacher" and "tends to grab anything on table before directions are given." *Id.*

In his August 2017 IEP report, Claimant was reportedly distractible and engaging in "off-task behaviors" during testing. Tr. 279. Claimant continued to require constant supervision and monitoring in order to participate safely and appropriately in the classroom. *Id.* His report card for

7

the period ending in January 2018 noted that, although he was showing improvement in some areas, he needed prompts to maintain appropriate behaviors and one-on-one assistance in almost all areas. Tr. 297. Also in January 2018, Claimant reportedly was progressing slowly towards his goals of participating and following classroom routines and activities through the day and of demonstrating an ability to self-regulate and independently complete an assigned activity within the same time period as classmates. Tr. 366, 370–71.

Erin Starr, another teacher of Claimant, completed a questionnaire in March 2018. Tr. 304–11. Ms. Starr reported that he had a "very serious problem" hourly in almost all areas related to this domain (and a "serious problem" in the one remaining area: "sustaining attention during play/sports activities"). Tr. 306. Ms. Starr explained that he "struggles to participate in activities he finds difficult." *Id.* Instead of doing such activities, he "flop[s] on the floor, run[s] away from his desk, knock[s] his desk over, [and] say[s] inappropriate words towards teacher and other peers." *Id.* Claimant "needs constant reminders to stay safe." *Id.*

The SSA classifies teachers as "non-medical sources" and has explained that they are "valuable sources of evidence for assessing impairment severity and functioning." Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006). The reports of a child claimant's teacher should be "afforded significant weight" when the reporting teacher had an extended opportunity to observe the claimant's functioning. *Titus ex rel. N.M.C. v. Colvin*, No. 12-CV-1056, 2014 WL 897038, at *9 (N.D.N.Y. Mar. 6, 2014) (citing *Edmond v. Barnhart*, No. 04-CV-6515, 2006 WL 2769922, at *10 (W.D.N.Y. Aug. 9, 2006) ("The Commissioner encourages the use of non-medical evidence provided by a teacher, who works with a child on a daily basis and observes him in a social setting with peers as well as adults.")). Here, Mss. Kostyniak and Starr both had extended opportunities to observe Claimant's functioning. Ms. Kostyniak saw Claimant five hours

a day, three days per week and seven hours a day, two days per week for seven months, and Ms. Starr saw Claimant six and a half hours a day, five days a week for six months. Tr. 227, 234, 304, 311.

Despite acknowledging the reports of Mss. Kostyniak and Starr and some of the other evidence discussed above, the ALJ rejects their reports and cites Claimant's independence, his efforts to complete tasks by himself, his willing "participation during activities he chose," and his willingness to answer questions from teachers. Tr. 25. The Claimant's modest successes in these areas, however, do not outweigh Claimant's other well-documented struggles in this domain. Claimant's school records are filled with examples of behavior the SSA has indicated is consistent with limited functioning. 20 C.F.R. § 416.926a(h)(3). Claimant is easily distracted, *e.g.*, Tr. 218, 279, 248, 256, 392–93, he repeatedly becomes sidetracked from his activities or interrupts others, *e.g.*, Tr. 230, 265, 279, 330, he is easily frustrated and gives up on tasks, *e.g.*, Tr. 265, 306, and he requires near constant supervision, *e.g.*, Tr. 229, 248, 265. 20 C.F.R. § 416.926a(h)(3)(i), (iii)–(v).

Further, the ALJ only cites to Claimant's March 2018 IEP report, which did reflect some improvement in this domain. Tr. 25, 357. For instance, Claimant was able to remain in his "square" for the duration of his music class and demonstrated improvement in his ability to remain on task in therapy sessions. Tr. 357–59. At times, Claimant was able to attend to instructions eighty-five percent of the time. Tr. 357. However, even the March 2018 report does not fully support the ALJ's conclusion; Claimant was only able to attend to instruction sixty percent of the time after a six-day break from school, and he was unable to recuperate the skill. *Id.* Further, his negative behaviors when attempting undesirable activities continued unabated and he was reportedly "aggressive and

9

disruptive" in the classroom. Tr. 357–59.[4] Claimant's difficulty in this area is well documented throughout his educational records. *E.g.*, Tr. 313–16.

The Commissioner cites to Plaintiff's testimony at the hearing and her prior statements regarding Claimant's behavior. ECF No. 15-1 at 11. The ALJ, however, did not discuss Plaintiff's statements in analyzing this domain and appears to have relied exclusively on Claimant's school records. Tr. 24–25. "The Court may not affirm the ALJ's decision based on the Commissioner's *post hoc* rationalization." *Agostino v. Comm'r of Soc. Sec.*, No. 18-CV-1391, 2020 WL 95421, at *4 (W.D.N.Y. Jan. 8, 2020). Further, Plaintiff's statements appear consistent with Claimant's school records reflecting at least marked limitations in this domain. She testified that Claimant's ability to attend to and complete tasks was "typical for a five year [old]," but she also said that he does not "really complete a task." Tr. 42. She explained that he "would start [a task] and then he would go venture off to doing something else" and, "for the most part[,] he usually doesn't finish the task." *Id.* She also cited examples of Claimant having difficulty sitting still, veering off task when he is not seated directly next to the teacher, and causing disruptions in class when transitioning between activities, such as throwing toys and pushing over chairs. Tr. 49–51.

In a questionnaire for children ages twenty-seven through thirty-two months, Plaintiff reported that Claimant sometimes would not follow directions. Tr. 209–13. Plaintiff further

---

[4] Even if the March 2018 IEP report were a harbinger for Claimant's newfound ability to attend to and complete tasks, it does not support the ALJ's conclusion that Claimant was not disabled prior to the period discussed in that report. A "disability" under the Act requires only an impairment that "lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). "A closed period of disability refers to when a claimant is found to be disabled for a finite period of time which started and stopped prior to the date of the administrative decision granting disability status." *Carbone v. Astrue*, No. 08-CV-2376, 2010 WL 3398960, at *13 n.12 (E.D.N.Y. Aug. 26, 2010) (internal quotation marks omitted). "[I]f a claimant is disabled at any point in time, the ALJ should consider not only whether Plaintiff was disabled at the time of the hearing, but also whether Plaintiff was entitled to disability benefits for any closed, continuous period of not less than 12 months, following the date of his claim." *Williams ex rel. J.J.W. v. Colvin*, No. 15-CV-144, 2016 WL 3085426, at *4 (W.D.N.Y. June 2, 2016) (internal quotation marks omitted). In other words, it is necessary "to consider every period during which Plaintiff may have been disabled." *Peña v. Barnhart*, No. 01-CV-502, 2002 WL 31487903, at *11 (S.D.N.Y. Oct. 29, 2002).

completed a "Function Report" in March 2016 and indicated that Claimant was limited in his ability to pay attention and stick with tasks. Tr. 170, 176. She said that he can only pay attention to TV, music, reading aloud, or games for fifteen minutes.[5] *Id.* Overall, Plaintiff's testimony and prior statements regarding Claimant's performance are largely consistent with the extensive school records documenting marked limitations in this domain.

The Commissioner further argues that the ALJ was not required to explicitly recite every shred of evidence in the record. ECF No. 15-1 at 12 (citing *Sewar v. Berryhill*, No. 17-CV-6211, 2018 WL 3569934, at *2 (W.D.N.Y. July 25, 2018) ("[I]t is not required that the ALJ have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." (internal quotation marks and brackets omitted)). Although the Commissioner is correct, the ALJ's decision must still be grounded in substantial evidence, and the Court must consider the record as a whole. *Sewar*, 2018 WL 3569934, at *1 ("[T]he Court carefully considers the whole record, examining evidence from both sides because an analysis of the substantiality of the evidence must also include that which detracts from its weight." (quoting *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (other quotation marks omitted))). Given the incredible weight of the evidence favoring a finding that Claimant suffers from at least marked limitations in this domain, the Court cannot conclude that the ALJ's contrary finding is supported by substantial evidence. *See Perkins ex rel. J.P. v. Astrue*, 32 F. Supp. 3d 334, 342–43 (N.D.N.Y. 2012) (finding that Claimant's teacher identifying "obvious" and "very serious" problems in this domain despite claimant's highly structured environment was "plainly indicative of a marked limitation").

---

[5] The Commissioner cites Claimant's ability to pay attention for fifteen-minute intervals positively, ECF No. 15-1 at 11, but the SSA's Function Report, which was specifically designed for children three to six years of age, only included options for fifteen and thirty minute intervals, Tr. 170, 176. In other words, Plaintiff selected the shortest available interval of time to describe Claimant's attention span.

11

### B.    Acquiring and Using Information

The acquiring and using information domain focuses on a child's ability to acquire or learn information and to use the information that he or she has learned. 20 C.F.R. § 416.926a(g). As with the domain of attending and completing tasks, the regulations provide standards by which an ALJ should evaluate this domain. For preschool children, the regulations provide:

> When you are old enough to go to preschool or kindergarten, you should begin to learn and use the skills that will help you to read and write and do arithmetic when you are older. For example, listening to stories, rhyming words, and matching letters are skills needed for learning to read. Counting, sorting shapes, and building with blocks are skills needed to learn math. Painting, coloring, copying shapes, and using scissors are some of the skills needed in learning to write. Using words to ask questions, give answers, follow directions, describe things, explain what you mean, and tell stories allows you to acquire and share knowledge and experience of the world around you. All of these are called "readiness skills," and you should have them by the time you begin first grade.

*Id.* § 416.926a(g)(2)(iii).

"A child may be limited in Acquiring and Using Information if her expressive and language skills are lower than the expected level of functioning for her age. Examples including a child who does not use language appropriate for her age, has difficulty explaining things or comprehending directions, or talks only in short, simple sentences." *Pomales ex rel. A.N.J. v. Comm'r of Soc. Sec.*, No. 18-CV-851, 2019 WL 6522854, at *3 (W.D.N.Y. Dec. 4, 2019) (citing SSR 09-3P, 2009 WL 396025, at *6 (Feb. 17, 2009)).

Claimant has a well-documented speech delay, which may have been caused by lead poisoning. Tr. 193, 197, 215, 220. Claimant receives speech-language therapy. Tr. 215. Based on the record, Claimant's speech delay and impaired cognitive functioning at minimum markedly limit his abilities in this domain.

In December 2015, BHSC reported that Claimant's pre-academic skills were moderately delayed with a percentile rank of nine; that his functioning fell in the below average range of

intellectual abilities; that his receptive and expressive language skills were moderately delayed; that he had difficulty understanding age expected questions and directions; that his verbal skills were in the borderline range; and that his speech production skills were severely delayed. Tr. 391–92. BHSC's assessment placed Claimant in the tenth percentile for auditory comprehension and the ninth percentile for expressive communication. Tr. 217, 392.

Some of BHSC's evaluations were more positive. In a December 2015 BHSC evaluation, the evaluator noted that Claimant was able to follow single step verbal and visual instructions, but his "speech was very hard to understand." Tr. 396. In November 2015, a psychological evaluation administered by BHSC found that Claimant was meeting speech milestones within normal limits but his speech was difficult to understand. Tr. 400. Claimant was further noted to have some difficulty understanding directions, but as he "became comfortable" he was cooperative with testing, able to attempt all tasks, able to follow directions, and attempted to respond to questions. Tr. 401. He successfully pointed to pictures and responded to some questions but "his understanding of vocabulary and questions was inconsistent[] and not up to age-level." *Id.* Claimant had particular difficulty with puzzles and did not appear to have problem solving strategies. *Id.* The psychological evaluation ultimately concluded that Claimant "performed below to significantly below expected levels for his age [i]n tasks [that] . . . measure language ability, language development, and the ability to acquire, retain, and retrieve general factual knowledge." *Id.*

In his IEP report from January 2016, Claimant was noted to have "delays in his . . . ability to follow directions [and to] . . . respond appropriately to questions." Tr. 217. In his IEP report from May 2016, Claimant was reported to be progressing gradually with respect to following multi-step directions, to be able to follow single step directions only if those directions omitted

concepts he did not understand (like colors or numbers), and to be unable to follow two-step directions. Tr. 199, 201. Claimant was reported to be progressing satisfactorily and on track to complete his goal of improving certain phonological processes but was having difficulties in other areas related to his speech and in responding appropriately to questions. Tr. 200. In December 2016, his classroom teacher reported that Claimant was unable to identify letters, numbers, and shapes and was inconsistent with color naming and identification. Tr. 265. Although testing revealed Claimant to be ninety-five percent intelligible, he was also reported to have difficulty responding to questions and have numerous other issues related to his speech. *Id.* It was further noted by his counselor that Claimant "struggles with verbal communication when asked questions regarding his behavior." Tr. 266.

In April 2017, Ms. Kostyniak reported that Claimant had serious problems understanding and participating in class discussions, learning new material, applying problem-solving skills in class discussions; very serious problems providing organized oral explanations and adequate descriptions and recalling and applying previously learned material; and obvious problems in all other relevant areas of this domain. Tr. 228, 234. His teacher reported that he struggles to understand what is being asked of him and, during discussions, he "mostly responds off topic." *Id.* His teacher also reported difficulty understanding his speech. Tr. 231.

Claimant's speech issues were also noted in a Buffalo Public Schools "Speech-Language Report" completed in February 2017. Tr. 252–55. He scored in the second percentile in core and receptive language and the eighth percentile in expressive language. Tr. 252. Compared to peers, his receptive language skills were in the very low range; his expressive language skills were in the borderline/low range; his ability to use appropriate word and sentence structures was in the low range; and his abilities to name pictures of basic concepts and common objects, persons, and

14

actions were in the low range. Tr. 253. But the report noted that his speech production and intelligibility were age appropriate, that he had an average ability to repeat sentences, and that "[a]ll other aspects of communication, including voice and fluency are adequate for communication in the academic setting." *Id.* These same observations were carried forward into Claimant's August 2017 IEP report. Tr. 278–79. Claimant was also reported to be in the "extremely low range" of cognitive abilities, and he continued to struggle with identifying numbers and letters. Tr. 279.

In the Buffalo Public Schools "Psycho-educational Evaluation" completed in April 2017, Claimant's articulation errors were noted, "which at times made him difficult to understand." Tr. 248. The evaluator also noted that he "struggled to understand what was being asked of him on some tasks." *Id.* The evaluation rated his "Full Scale IQ" as 51, which means "he scored at a level better than or equal to 0.1% of other children his age," but the evaluator noted that the results "may underestimate [hi]s current ability levels, particularly on the cognitive assessment" due to his "behaviors and poor motivation during testing." Tr. 248–49. He also scored in the "Extremely Low range" in various areas of verbal reasoning. Tr. 249, 251. "[H]e demonstrate[d] deficits in early numeracy and literacy skills, as he struggled to identify numbers and letters." Tr. 251.

In Ms. Starr's March 2018 teacher evaluation, Claimant reportedly had a "very serious problem" in almost all areas related to this domain (and a "serious problem" in the remaining two areas). Tr. 305. Ms. Starr noted that he requires "close adult supervision throughout the day." *Id.* Ms. Starr, however, reported that almost all of Claimant's speech was understandable. Tr. 308.

In his March 2018 IEP report, Claimant was reportedly "just below grade level in reading" and able to answer questions regarding the stores he has heard, but he still gets off task and scored poorly in assessments. Tr. 328–29. In the IEP, it was also noted that Claimant made "some progress

15

in the areas of speech and language development" and other areas, but Claimant continued to have difficulty "listening quietly for information," understanding and following one to two step directions, and using expressive language. Tr. 329. The IEP report also noted some improvements in number recognition and color and shape matching but noted a continued inability to write his own name and noted struggles with regard to writing letters and numbers. Tr. 331. Claimant scored "unsatisfactorily on the My Math pretest." Tr. 329. The report further noted that Claimant's "delays impact his ability to participate in the classroom" and noted "[d]eficits in receptive language[,] . . . vocabulary/semantics[,] . . . [and] [e]xpressive language." Tr. 331–32.

Again, although he acknowledged their evaluations, the ALJ eschewed the reports of Mss. Kostyniak and Starr based exclusively on Claimant's school records. Tr. 24. The ALJ concluded that he has less than marked restrictions in this domain because he "actively participated in class," "followed directions," had a "generally positive" attitude, had "gotten better about 'remaining in his square,'" had an ability to work well independently and with peers, could answer questions regarding stories he listened to, and the March 2018 IEP noted that his reading skills and basic understanding of concepts of print were emerging. *Id.* It is unclear, and the ALJ does not explain, how Claimant's "generally positive" attitude, ability to remain in his square, and ability to work with peers is relevant to his performance in this domain. It appears that such characteristics are more relevant to his capabilities in other domains, particularly interacting and relating with others and attending and completing tasks. *See* 20 C.F.R. § 416.926a(g)–(i).

In any event, in analyzing Claimant's performance in this domain, the ALJ ignores large swaths of the record demonstrating that Claimant had difficult participating in class, following directions, anger issues, difficulty working with his peers, difficulty responding appropriately to questions, and significant cognitive delays. The ALJ's incorporation of only the statements from

16

these records that supported his opinion, while ignoring the others, was error. *See Younes v. Colvin*, No. 14-CV-170, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) (although an ALJ is free to credit only a portion of a medical opinion, "when doing so smacks of 'cherry picking' of evidence supporting a finding while rejecting contrary evidence from the same source, an administrative law judge must have a sound reason for weighting portions of the same-source opinions differently"); *Phelps v. Colvin*, No. 12-CV-976, 2014 WL 122189, *4 (W.D.N.Y. Jan. 13, 2014) ("The selective adoption of only the least supportive portions of a medical source's statements is not permissible." (internal quotation marks and brackets omitted)).

The SSA has stated that "school records are often a significant source of information about limitations in the domain of 'Acquiring and using information'" for preschool children. SSR 09-3P, 2009 WL 396025, at *3 (Feb. 17, 2009). Here, although there are a few records documenting modest successes, Claimant's school records as a whole point toward a finding of marked limitations in this domain. The SSA has indicated that special education services, front-row seating in the classroom, occupational therapy, speech/language therapy, and counseling services are all indications that "a mental or physical impairment[] may be interfering with a child's ability to acquire and use information." *Id.* Claimant ticks all those boxes. Tr. 46–47, 229, 261, 276, 328, 355.

The Commissioner argues that Claimant "quickly demonstrated progress" in addressing his speech deficiencies once he was enrolled in speech-language therapy and the ALJ was able to understand Claimant at the hearing (with some pronunciation difficulties). ECF No. 15-1 at 13–15; Tr. 39–40. Although there are some records reflecting positive improvement in Claimant's speech production, such as Ms. Starr's evaluation, *e.g.*, Tr. 202, 308, Claimant's continued

struggles in receptive language are well documented. Tr. 228, 249, 251–52, 278–79, 305, 329, 331–32.

The Commissioner further cites to some of Claimant's strengths reported in his "Checkpoint Progress Report" from Spring 2016. ECF No. 15-1 at 14–15; Tr. 202–04. While that report certainly documents some of Claimant's strengths in this domain, the ALJ did not discuss this evidence in analyzing Claimant's functioning. Tr. 24. Again, "[t]he Court may not affirm the ALJ's decision based on the Commissioner's *post hoc* rationalization." *Agostino*, 2020 WL 95421, at *4. The Commissioner's argument also fails on the merits.

The report highlights Claimant's strengths achieved in a highly structured setting, which limits its probative value. *See Smith*, 2002 WL 34242375, at *6. Other portions of the report also point to difficulties in this domain, despite Claimant's highly structured educational environment. For instance, Claimant was making less than anticipated progress toward his goal of following oral, multi-step directions; he did not achieve his goal of following oral, two-step directions; he did not know colors or numbers; and he needed prompts to answer "wh" questions ("e.g., who, what, when, why") "with some accuracy." Tr. 200–01. The Spring 2016 report is accordingly insufficient to outweigh the very serious impairments in this domain noted throughout Claimant's school records. Tr. 248–55, 265–66, 278–79, 328–29, 391–92.[6]

---

[6] Although not relied on by the Commissioner or cited specifically by the ALJ in his analysis of Claimant's functioning in the domains of attending and completing tasks and acquiring and using information, the ALJ does give "partial weight" to the opinions of State agency consultative examiners Dr. Austin-Small, a psychologist, and Dr. Bostic, a pediatric physician. Tr. 22–23. They found that Claimant had less than marked restrictions in the domain of attending and completing tasks and no limitations in the domain of acquiring and using information. Tr. 22, 61–62. The ALJ gave their opinion partial weight because "evidence after their initial determination suggests that [C]laimant is far more limited than [they] found." Tr. 23. The Court agrees. Given the weight of the evidence in the record, including evidence submitted after Drs. Bostic and Austin-Small issued their opinion, their opinion does not provide substantial evidence supporting the ALJ's decision. *See Perkins ex rel. J.P.*, 32 F. Supp. 3d at 341–42 (finding that ALJ's decision was not supported by substantial evidence where claimant's teacher "assessed 'very serious' problems" in a domain even though a consultative examiner's assessment "based on a single examination" supported the opposite conclusion).

In short, the record conclusively demonstrates that Claimant suffers from very serious difficulties in acquiring and using information, even in a highly supportive setting. The evidence here demonstrates, at minimum, a marked limitation in this domain. *See St. Louis ex rel. D.H. v. Comm'r of Soc. Sec.*, 28 F. Supp. 3d 142, 153 (N.D.N.Y. 2014) (holding that teacher's opinions about claimant's "marked and extreme difficulties with many activities related to acquiring and using information [required] a finding that [claimant] ha[d] a marked limitation in this domain").

## II.   Remand for Calculation and Payment of Benefits

Plaintiff argues that the Court should remand for a calculation and payment of benefits only. ECF No. 10-2 at 28–29. The Commissioner does not respond to this argument. ECF No. 15-1 at 19.

Courts may affirm, reverse, or modify a decision of the Commissioner "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand for calculation of benefits is appropriate only in cases where the record "provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). Courts should avoid "contribut[ing] any further to the delay of the determination of [a claimant]'s application by remanding for further administrative proceedings" when such an instruction would prove unnecessary. *Diaz ex rel. E.G. v. Comm'r of Soc. Sec.*, No. 06-CV-530, 2008 WL 821978, at *8 (W.D.N.Y. Mar. 26, 2008). "Delay is harmful for any litigant, but particularly in connection with benefits for children, which are not to replace lost income, but to enable low-income families to afford special education, medical treatment, physical rehabilitation, early intervention services, and personal needs assistance for the child." *Brown ex rel. J.B. v. Colvin*, No. 12-CV-1062, 2015 WL 1647094, at *9 (W.D.N.Y. Apr. 14, 2015) (internal quotation marks omitted).

To functionally equal the Listings and therefore establish disability, the child's impairment must cause marked limitations in two domains or an extreme limitation in one domain. 20 C.F.R. § 416.926a(a). Here, the record demonstrates that Claimant has, at minimum, marked limitations in two domains—attending and completing tasks and acquiring and using information. Claimant is accordingly disabled, and remand to the Commissioner for further proceedings "would serve no productive purpose, would not produce findings contrary to this Court's conclusions, and would only cause further delay."[7] *Perkins ex rel. J.P.*, 32 F. Supp. 2d at 344. "To remand the case for further consideration would be futile, as the only conclusion supported by the record evidence is that [Claimant] suffers a marked limitation in at least two domains, and is therefore disabled pursuant to the Commissioner's regulations." *Brown ex rel. J.B.*, 2015 WL 1647094, at *9 (citing 20 C.F.R. § 416.926a(d)).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings, ECF No. 10, is GRANTED, the Commissioner's motion for judgment on the pleadings, ECF No. 15, is DENIED, and the matter is REMANDED to the Commissioner solely for calculation and payment of benefits. The Clerk of Court shall enter judgment and close this case.

IT IS SO ORDERED.

Dated: September 15, 2020
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court

---

[7] Plaintiff applied for SSI nearly five years ago. Tr. 58, 154.